IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JACK L. SLINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:17-cv-00723 |
| | ) | |
| THE PENDAFORM COMPANY, | ) | JUDGE RICHARDSON |
| | ) | MAGISTRATE JUDGE NEWBERN |
| Defendant. | ) | |

## MEMORANDUM AND FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52

### I. Introduction[1]

Plaintiff initially filed this action in Davidson County Chancery Court. On April 19, 2017, Defendant removed the action to this Court. The Court granted summary judgment to Defendant, but the Sixth Circuit reversed on July 11, 2019. The Court held a one-day bench trial in this case on November 25, 2019 before District Judge William L. Campbell, Jr.

On February 3, 2020, as directed by Judge Campbell, each party filed proposed findings of fact and conclusions of law (Doc. Nos. 95, 96). On February 14, 2020, Judge Campbell recused himself, and this case was reassigned to the undersigned district judge. (Doc. No. 101). Thereafter, in a series of orders issued after receipt of input from the parties, the undersigned endeavored to determine how to proceed, given that: (1) findings of fact and conclusions of law remained to be issued by the Court; (2) the undersigned had not been present for the testimony that was presented live (*i.e.*, in-person at trial, as opposed to by read-back of depositions) at the bench trial before

---

[1] For purposes of this Introduction, the Court assumes the reader's general familiarity with the names and items referred to in the Introduction and notes that such are clearly identified below.

Judge Campbell;[2] (3) live testimony potentially could assist the undersigned in making findings of fact with respect to any facts truly in dispute, especially to the extent that such findings would turn on credibility determinations as to the witnesses who had testified live (*i.e.*, Plaintiff and Mr. Kruger); (4) the issue of the enforceability of the Non-Solicitation Clause in the parties' Employment Agreement had been raised but not yet decided.

Ultimately, the undersigned issued two rulings that dictated what should (and should not) happen next in this case. First, the Court ruled that the Non-Solicitation Clause was unenforceable. (Doc. No. 113). Second, the Court ruled that Defendant had waived (or forfeited) the right to assert that: (a) Plaintiff's termination was for any "cause" other than breach of the Non-Solicitation Clause (Doc. No. 120); (b) failure to pay Plaintiff the severance alleged owed him was justified by Plaintiff's (alleged) non-compliance with the obligations imposed upon him by subparagraph 6(b) and paragraph 7 of the Employment Agreement. Together, these rulings had the effect of eliminating the need to address herein some of the issues the Court otherwise perhaps would need to address herein. Likewise, the Court's detailed explanation for these rulings eliminated the need for the Court to explain (beyond merely referring to the Court's prior orders) herein the reasons for those rulings.

The content set forth below shall constitute the findings of fact and conclusions of law required by Fed. Rule Civ. P. 52. The Court notes that the findings of fact cover some (though not all) events and circumstances that—because of the Court's above-referenced rulings—are not

---

[2] The only witnesses to testify live at the bench trial were Plaintiff and Defendant's president, David Kruger.

material to the Court's conclusions of law (and resulting resolution of Plaintiff's claim) but are part of the overall context of Plaintiff's claim and thus worth recounting.[3]

## II. Findings of Fact[4]

At material times, Defendant was a company engaged in the business of extruding and thermoforming black plastic components for use primarily in the automotive industry. (Plaintiff, at 29).[5] After its below-referenced acquisition by another company in December 2016, Defendant was headquartered in New Concord, Ohio, having previously been headquartered in Portage, Wisconsin. (*Id.* at 29-30). On July 11, 2011, Plaintiff Jack Slinger entered into an Employment Agreement with the Defendant establishing his position as President and Chief Executive Officer ("CEO") with Defendant. (Employment Agreement, at 1 (Plaintiff's Trial Exhibit 1); Plaintiff, at 59).[6] Defendant understood that the contract remained binding and in effect even after the December 2016 acquisition of Defendant. (Kruger, at 169-70).

The contract defined the "Employment Period" as expiring on July 11, 2014, but that period was later extended to July 11, 2017. (Employment Agreement, at ¶ 5 (Plaintiff's Trial Exhibit 1);

---

[3] They also are worth recounting because, as the Court fully realizes, Defendant contends that the Court's rulings are incorrect, and to the extent such contention is valid, some of these events and circumstances would be relevant.

[4] As indicated below, the Court makes some of the below-referenced findings based on the testimony of Plaintiff, or Mr. Kruger, or both. None of these findings, in the Court's view, are contested in any substantial way, and to the extent they may be contested to a degree, none are material to the Court's conclusions of law herein. For these reasons, the Court saw no need to take live testimony from Plaintiff or Mr. Kruger in order to assist with credibility determinations.

[5] Citations herein to trial testimony will be in the form of ([last name of witness or counsel speaking], at [page number of the trial transcript (Doc. No. 94)]. As indicated above, live testimony was presented of only two witnesses, *i.e.*, Plaintiff and Mr. Kruger; the testimony presented of all other witnesses was presented by reading portions of their deposition testimony.

[6] All (trial) exhibits cited herein are all joint exhibits and are marked as such on their first page. But on the Court's exhibit sticker, affixed to the back page of each exhibit, every such exhibit is labeled as a Plaintiff's exhibit and will be referred to as such in the citations herein.

3

Amendment No. 1 (p. 16 of 20)). The Employment Period was subject to early termination upon the occurrence of certain events, however, including "Termination For Cause" and "Termination Without Cause." (*Id.*, ¶ 5).

If the company terminated Plaintiff early "without cause," it was conditionally obligated to continue to pay him his base salary and other benefits:

> (b)  Subject to Executive's compliance with subparagraph 6(d) and paragraph 7, if the Employment Period ends early pursuant to paragraph 5 on account of a Termination Without Cause that occurs during the Employment Period, the Company shall continue to pay Executive his Base Salary at the time of such termination, in accordance with the Company's normal payroll practices, for a period of twelve (12) months following such Termination Without Cause; <u>provided</u>, <u>however</u> if such Termination Without Cause is required in connection with a Change in Control then such period will be extended by an additional twelve (12) months for a total of twenty-four (24) months. In addition, Executive shall be entitled to continue to participate in the Company's medical plan (with a monthly premium cost to Executive equal to the amount Executive was required to pay as a monthly premium for participation in such plan immediately prior to the Termination Without Cause, which amount shall be withheld by the Company from the payments made to Executive described in the preceding sentence) until the earlier of (i) Executive's eligibility for any such coverage under another employer's or any other medical plan or (ii) twelve (12) months following the termination of Executive's employment. Executive agrees that the period of coverage under such plan shall count against such plan's obligation to provide continuation coverage pursuant to COBRA. It is expressly understood that the Company's payment obligations and Executive's participation rights under this subparagraph (b) shall cease in the event Executive breaches any of the agreements in paragraph 7 hereof.  To the extent
>
> that the payment of any amount under this subparagraph 6(b) constitutes "nonqualified deferred compensation" for purposes of Code Section 409A (as defined in paragraph 23 hereof), any such payment scheduled to occur during the first sixty (60) days following the termination of employment shall not be paid until the first regularly scheduled pay period following the sixtieth (60th) day following such termination and shall include payment of any amount that was otherwise scheduled to be paid prior thereto.

(*Id.*, ¶ 6(b)).

"Termination without cause" was defined as termination other than either a termination for permanent disability (which is not implicated in this case) or a termination for cause. (*Id.*, ¶ 8(f)). "Termination For Cause" is defined by the contract to include a list of circumstances, including "violation of paragraph 7." (*Id.*, ¶ 8(e)). Paragraph 7 prohibits certain competitive activity, and includes the following provision ("Non-Solicitation Clause"):

> Executive will not directly or indirectly at any time during the period of Executive's employment or for a period of two (2) years thereafter, attempt to disrupt, damage, impair or interfere with the Company's Business by raiding any of the Company's employees *or soliciting any of them to resign from their employment by the Company*, or by disrupting the relationship between the Company and any of its consultants, agents, representatives or vendors. Executive acknowledges that this covenant is necessary to enable the Company to maintain a stable workforce and remain in business.

(*Id.*, ¶ 7(d) (emphasis added)). Before trial, Defendant conceded that the company is relying only on the alleged breach of the Non-Solicitation Clause as a basis for termination for cause. *Slinger v. Pendaform Co.*, 779 Fed. Appx. 378, 380 n. 1 (6th Cir. 2019). For this and other reasons, as noted above, the Court has concluded that Defendant is precluded from now asserting other bases as termination for cause, and also from asserting any other alleged noncompliance with subparagraph 6(b) or paragraph 7, as justification for the non-payment of severance which otherwise would be owed to Plaintiff. (Doc. No. 120).

The Employment Agreement also contains a severability clause:

> 12.    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid or unenforceable in any respect under any applicable law, such invalidity or unenforceability shall not affect any other provision, but this Agreement shall be reformed, construed and enforced as if such invalid or unenforceable provision had never been contained herein.

(Employment Agreement, ¶ 12 (Plaintiff's Trial Exhibit 1)).

The Employment Agreement provides that Wisconsin law governs disputes, and the parties agree that Wisconsin law applies here. (*Id.*, ¶ 17).

On December 22, 2016, Defendant was acquired (from its then-owners, Resilience Capital) by TriEnda Holdings, LLC ("TriEnda"), a wholly owned subsidiary of Kruger Brown Holdings, LLC ("KBH"). (Kruger, at 256; Plaintiff's Exhibit 2).[7] KBH is owned by Warren Kruger, his son, David Kruger, and John Brown.[8] (Kruger, at 159). Following the acquisition, Mr. John Brown and David Kruger were installed as CEO and President, respectively, of the surviving corporation, Pendaform. (*Id.*, at 94). Mr. Kruger informed Plaintiff that he would no longer act as President and CEO, but that the company would honor his contract. (*Id.*, at 261-62). Mr. Kruger testified that it was in the company's financial interest to pay Plaintiff through the July 11, 2017 term of the contract because it was less expensive than paying the severance amount. (*Id.*, at 262-63). During that time, Mr. Kruger told Plaintiff he would be expected to stay at home (in Nashville), forward company emails to Mr. Kruger, and answer any questions directed to him from Mr. Brown and Mr. Kruger. (Plaintiff's Trial Exhibit 5; Kruger, at 262, Plaintiff, at 34). Mr. Kruger testified that Plaintiff complied with these directives and that Plaintiff was "friendly, respectful, and cordial." (Kruger, at 169).

KBH planned to substantially downsize Defendant's staff and activities after the acquisition. For example, Defendant's goal was to shut down its New Concord, Ohio, office facility within 12 to 24 months after the acquisition. (*Id.*, at 161). Moreover, shortly after the

---

[7] The details of the acquisition and subsequent corporation organization are immaterial for present purposes, but the acquisition was considered a so-called "reverse merger" and was sometimes at trial referred to as the "merger."

[8] Mr. Kruger testified that he and his father bought out Mr. Brown's ownership interest a couple of weeks before trial. (Kruger, at 159).

acquisition, in early 2017, Defendant closed down part of the operations (the thermoforming operations)[9] of its plant in Bluffton, Indiana. (Plaintiff, at 60; Kruger, at 260).[10] And by the time of the below-referenced events of February 23, 2017, Defendant had laid off a number of employees. (White, at 80).

On February 23, 2017 (a Thursday), with the permission of Mr. Kruger, Plaintiff traveled to the company's New Concord, Ohio, office to remove his personal belongings from his office there. (Kruger, at 263). Plaintiff arrived late in the morning and began cleaning out his office. (Plaintiff, at 40-41). According to Plaintiff, several employees came by to ask him how he was doing and to ask his plans for the future. (*Id.*, at 41-42). Plaintiff told them he thought the merger was going well, that he was not sure of his future plans, and generally wished them well. (*Id.*, at 41-42). Once he packed his boxes and put them in the case, he went to the two wings of the facility to say goodbye to those working there. (*Id.*, at 42). Plaintiff encountered two to three dozen people at the office, but he could not recall what they spoke about. (*Id.*, at 43). Plaintiff could not recall saying: "Don't be the last man standing," but did not suggest anyone leave their employment with the company. (*Id.*, at 43-46). At that time, he had no other employment lined up and he did not want to jeopardize his employment with Defendant. (*Id.*, at 46-47). Plaintiff was at the New Concord facility for a little over an hour, then drove to Akron to spend the night with his parents. (*Id.*, at 47-48). Plaintiff returned to Nashville the next day. (*Id.*, at 48).

Over the weekend, Plaintiff tried to log in to his company email, but was unable to do so. (*Id.*, at 48). Late Monday afternoon, Mr. Kruger called, with Mr. Brown on the phone as well, and told Plaintiff that he was terminated for "gross misconduct" because he told employees "don't be

---

[9] The extruding operations at Bluffton were closed down somewhat later, in May 2017. (Kruger, at 260).

the last man standing." (*Id.*, at 50-51). At the time of his termination, as the parties stipulated, Plaintiff's annual base salary was $401,577. (Welborn, at 28).

Mr. Kruger received Mr. Oliver's forwarded email at 4:07 p.m. on Friday, February 24, 2017. (Kruger at 177; Plaintiff's Trial Exhibit 10). At 4:09 p.m., Mr. Kruger forwarded the email to Mr. Brown, and stated: "I think we should term his contract for breach." (Plaintiff's Trial Exhibit 11). It was "clear" to him that this was a "fireable offense," and he decided to terminate Plaintiff. (Kruger, at 181). When he advised Mr. Brown by email of this decision, Mr. Brown's response was to "stop all payments" to Plaintiff. (Plaintiff's Trial Exhibit 15).

On the following Monday (February 27), Mr. Kruger asked Sue Long, the human resources manager, to conduct an investigation. (Kruger, at 268; Plaintiff's Trial Exhibit 19). Ms. Long sent Mr. Kruger an email on Monday, at 12:40 p.m. advising him that the employees told her Plaintiff went through the New Concord facility "shaking hands, saying take care and don't be the last one standing." (Plaintiff's Trial Exhibit 18). Ms. Long's conclusion was based on conversations with five employees: Abby Shockling, Becky White, Derek Reichley, Gary Oliver, and Jeremy Mohler. (Plaintiff's Trial Exhibit 19).

On the afternoon of February 27, Mr. Kruger (with Mr. Brown on the line) telephoned Plaintiff to advise him that he was being terminated for gross misconduct. (Kruger, at 270; Plaintiff, at 50-51). Mr. Kruger did not mention the Non-Solicitation Clause when he terminated Plaintiff, (Plaintiff, at 51), but instead relied on "gross misconduct." (*Id.*, at 51; Kruger, at 270). Mr. Kruger was not aware of any business Plaintiff would be soliciting employees to join if they left Pendaform. (Kruger, at 196).

The next day, Mr. Kruger sent Plaintiff an email attaching a termination letter, which gave notice to Plaintiff that he was being terminated for cause, effective that day, "in connection with

8

[Plaintiff's] actions on February 23, 2017 and in connection with [Defendant's] investigation into those actions." (Plaintiff's Trial Exhibit 22). The letter did not state any basis for declaring the termination as "termination for cause." (*Id.*). Plaintiff's termination letter made clear that Plaintiff would not be receiving any severance payments. (*Id.*). Mr. Kruger had told Plaintiff that he would not receive any severance payments, and in fact Plaintiff has received none. (Plaintiff, at 51).

Plaintiff offered the deposition testimony of three of the New Concord employees who spoke with Plaintiff on February 23, 2017: Becky White, Amy Hoefler, and Abby Shockling. Defendant offered the deposition testimony of two of those employees: Jeremy Mohler and Gary Oliver. The Court credits as true all of the below-cited testimony of these respective deponents. Ms. White testified that Plaintiff came by on that day to "tell me good-bye, and he just wanted to say good-bye and good luck and don't be the last man standing." (White, at 79). When asked what she understood that phrase to mean, Ms. White testified as follows:

> Q.  What did you understand him to be saying when he said "Don't be the last man standing"?
>
> A.  I understood him to be saying that the thoughts that we had about the company going to close and going downhill, which we were all aware of was going to happen, could possibly happen a lot faster than we thought it was going to. That was my thought.
>
> Q.  When he told you "Don't be – don't be the last man standing," did that make you think that you needed to look for another job?
>
> A.  No, because we had all had that feeling before. It wasn't any – it wasn't a new feeling. It was just, ah, like I said, it's going to happen.
>
> * * *
>
> Q.  So are you saying that the morale was not adversely impacted?
>
> A. I don't think it was adversely impacted, because we knew it was coming. But it definitely reassured us that it was going to happen.
>
> * * *

9

A. . . . I can say that he did say –

Q. Sure.

A. – "Don't be the last man standing."

Q. Did you take that as an instruction of an executive of the company to you?

A. No. I think I took it as good luck and I hope things work out. I – I don't really know how to really answer that question. I don't think he was saying get the heck out of here now, because if you don't –

Q. Okay.

(*Id.*, at 79, 84, 88-89).

Amy Hoefler testified that she had a brief conversation with Plaintiff on the day he visited the New Concord facility: "He came around and shook my hand and just basically said that he was leaving, and he had enjoyed working with me and wished me the best of luck. And he said, 'Don't be the last man standing.'" (Hoefler, at 111). Ms. Hoefler also testified about what she took that phrase to mean:

Q. What was his demeanor when he said that to you?

A. I mean, he was – he was just friendly. It was friendly. And just – he was always very – it was just friendly and outgoing. It wasn't like a threat or anything. I – I mean, I didn't think anything of it, really. I think I laughed, actually, when he said it.

Q. Did you take it to be any type of order or instruction to you on how to act?

A. No. I mean, no. At the time I really didn't think anything about it.

* * *

Q. After Mr. Slinger left did you have any conversations with your co-workers about his visit?

A. Yes. We did talk about it.

Q. And who would that have been with?

10

A.  We were all pretty close. There was only a few of us left. I probably talked to, I think, Abby and Becky. I think – yeah, there was some people actually gone that day, too, so possible – I can't remember – possibly Jeremy, too. But I – I think we were more surprised that he was leaving than actually what he said. It was just – we had no idea he was leaving.

(*Id.*, at 111-13) Ms. Hoefler did point out that another employee, Gary Oliver, who was close to retirement, may have been upset about his interaction with Plaintiff, but in her opinion, "It wasn't a big deal until it became a bigger deal" when a human resources representative started calling New Concord employees about Plaintiff's visit. (*Id.*, at 114).  Ms. Hoefler "didn't really give it a second thought" and "took it as maybe friendly advice," but she hoped her employment would continue with the company. (*Id.*, at 120).

Abby Shockling testified that she recalls Plaintiff walking around and "he basically just said I think like good luck and don't be the last man standing, or something like that." (Shockling, at 135). Ms. Shockling testified she took that to mean "I guess just probably that we at the New Concord facility might not have our jobs too much longer," and that she should go look for another job. (*Id.*, at 135-36). After the interaction with Plaintiff, Ms. Shockling said the employees were worried and nervous about their jobs. (*Id.*, at 136-37). Ms. Shockling testified that Plaintiff did not encourage her to resign her employment with the company or to find a new job. (*Id.*, at 141).

Jeremy Mohler testified that he heard Plaintiff talking with other employees before he spoke with Mr. Mohler directly. (Mohler, at 214-25). Mr. Mohler recalled hearing Plaintiff "[t]elling people, you know, good luck, best wishes, to take care of themselves, to not go down with the ship and to not be the last man standing." (*Id.* at 215). Plaintiff told Mr. Mohler, "[t]hat I should take care of myself, you know, kind of look out for number one first, and you know, not to go down with the ship." (*Id.*). Mr. Mohler said he took those words to mean their jobs might be in jeopardy, and it might be in his best interest to look for another job. (*Id.*, at 215-16).  Mr. Mohler

11

explained that his concern was based on the uncertainty brought about by the acquisition. (*Id.*, at 217).

Of the five employees whose testimony was introduced at the trial, Gary Oliver was the most agitated by Plaintiff's visit to the New Concord facility. He testified that Plaintiff told him and other employees there "don't be the last man standing" and "look out for yourself, or take care of yourself." (Oliver, at 239-40). Mr. Oliver interpreted those words as meaning: "that we were all going to be let go so we better be looking for work." (*Id.*, at 240). Mr. Oliver testified that it "alarmed" him that Plaintiff would speak to the employees that way because it was "inappropriate" and evinced a lack of "professionalism." (*Id.*, at 240-41). On the other hand, Mr. Oliver explained, he was not "alarmed" about the idea that he probably should be looking for a job because "we've been hearing that for a year, year-and-a-half . . ." (*Id.*, at 241). Mr. Oliver later sent an email to his boss, Heidi Bulgrin, expressing his concerns about Plaintiff's statements.[11] (*Id.*, at 243-44). After Plaintiff left, Mr. Oliver testified, the employees expressed concern about their future with the

---

[11]    The email, dated February 24, 2017, provides:

> I thought you should know that Jack Slinger stopped by yesterday, did a run through the office, and basically gave everyone here the same message – "don't be the last man standing" . . "Take care of yourself" . . I don't know if while relaxing at home he just watched a Bruce Willis movie, or what, but for a guy who rarely spoke to any of us in 3 years, (except for Jim Cavezza) for him to make a special 5 minute run through, and then be gone, didn't sit right with me.

> I have tried a little damage control and told people what you and I talked about, that David and John would just like people to give them a chance, that they do not want to lose us . . . One responded "then why don't they tell us that?" To which I responded, give them time – they have a lot on their plate. [ ]

> Again, just thought you should know.

(Plaintiff's Trial Exhibit 9).

company, but Mr. Oliver told them "David and John [Kruger and Brown] asked us to give them a chance, and I think that's what we need to do." (*Id.*, at 242).

Some five months later, in July 2017, three of these five employees were terminated by the company. (White, at 87-88; Hoefler, at 119-20; Shockling, at 141; Kruger, at 195). Indeed, according to Mr. Kruger, all but one or two employees at New Concord were terminated at that time. (Kruger, at 162, 278). Mr. Mohler left the company voluntarily on January 24, 2018. (Mohler, at 221; Kruger, at 278). At the time of his deposition on March 8, 2018, Mr. Oliver was still employed by the company, but was terminated sometime before trial. (Oliver, at 228; Kruger, at 162, 279).

## III. Conclusions of Law

Plaintiff's sole remaining claim is Count II's claim for breach of contract,[12] whereby he seeks to recover unpaid severance under subsection 6(b) of the Employment Agreement. As noted above, Wisconsin law governs the Employment Agreement. (Exhibit 1 at § 17). Under Wisconsin law, a breach of contract claim consists of three elements: (1) an enforceable contract; (2) a breach of that contract; and (3) damages. *Brew City Redev. Grp., LLC v. Ferchill Grp.*, 714 N.W.2d 582, 588 (Wis. Ct. App. 2006).

Each of the three elements is satisfied here. First, undisputedly, the parties entered into a contract, the Employment Agreement, which remained in effect at the time in question. And while the Non-Solicitation Clause is unenforceable, as the Court has ruled, that does not mean that the Employment Agreement otherwise was unenforceable. In fact, based on its severability clause, the Employment Agreement's enforceability was otherwise unaffected, and Defendant does not assert

---

[12] The Court and each of the parties respectively has expressed its understanding that Count II is Plaintiff's only remaining claim. (Doc. No. 105 at 1; Doc No. 106 at 2; Doc. No. 107 at 2). Count II, captioned "Pretextual Termination With Cause," alleges that Defendant terminated Plaintiff purportedly with cause but actually without cause.

that it was unenforceable with respect to its provisions regarding Defendant's obligation to make the severance payment here at issue.

Second, Defendant breached the Employment Agreement. As noted, the Employment Agreement requires payment to Plaintiff of his full salary for one year after a termination "without cause," meaning a termination not for any of the causes listed in subparagraph 8(e)" (Employment Agreement, at ¶¶ 6(b), 8(f) (Plaintiff's Trial Exhibit 1)). This requirement is subject to certain conditions, namely Plaintiff's compliance with subparagraph 6(b) and paragraph 7 of the Employment Agreement.

Defendant cannot rely on a violation of the Non-Solicitation Clause to establish that Plaintiff's termination was for cause, because the Non-Solicitation Clause is unenforceable under this Court's prior determination. And as the Court likewise previously has held, Defendant has waived any assertion that Plaintiff's termination was for any cause other than violation of the Non-Solicitation Clause, or that non-payment of severance was contractual justified based on Plaintiff's non-compliance with something other than the Non-Solicitation Clause. So Plaintiff has established that he was terminated without cause and that payment of severance therefore was contractually required, irrespective of the conditions that conceivably could have obviated that requirement. By failing to pay the severance as required, Defendant breached the Employment Agreement.

Finally, Plaintiff has been damaged by the breach. Had Defendant not breached and instead had paid the severance as required, Plaintiff would have been entitled to severance amounting to his annual salary of $401,577, not to mention potential other benefits mentioned in subparagraph 9(b) of the Employment Agreement.

For these reasons, the Court finds and concludes that Defendant breached the Employment Agreement by terminating Plaintiff without payment of the amount to which he is entitled under that contract. By January 27, 2021, Plaintiff shall file a supplemental brief stating the amounts due under the contract, including any request for attorney's fees. Defendant shall file any response within 14 days of the date Plaintiff makes his filing.

IT IS SO ORDERED.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE